01

02

03

04

05

06          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
07                  AT SEATTLE

08  ROBERT DURALL,                    )    CASE NO. C06-1012-MJP
                                      )
09        Petitioner,                 )
                                      )
10        v.                          )    REPORT AND RECOMMENDATION
                                      )
11  KENNETH QUINN,                    )
                                      )
12        Respondent.                 )
    _____ )

13

14           INTRODUCTION AND SUMMARY CONCLUSION

15        Petitioner is currently in the custody of the Washington Department of Corrections

16  pursuant to his King County Superior Court conviction for first degree murder.  He has filed a

17  petition for writ of habeas corpus under 28 U.S.C. § 2254 seeking relief from his conviction and

18  his exceptional sentence.  Respondent has filed an answer to the petition as well as relevant

19  portions of the state court record.  Petitioner has filed a reply to respondent's answer.  The

20  briefing is now complete, and this matter is ripe for review.  This Court, having reviewed the

21  petition, the briefs of the parties, and the state court record, concludes that petitioner's federal

22  habeas petition should be denied and this action should be dismissed with prejudice.

REPORT AND RECOMMENDATION
PAGE -1

01                                          FACTS

02         The Washington Court of Appeals summarized the facts surrounding petitioner's crime and

03  conviction as follows:

04         Robert and Carolyn Durall were married in 1986.  They had three children.
    Durall worked for the King County Housing Authority as its information systems
05  director.  Carolyn was a secretary at an investment firm.  Problems in their marriage
    led Carolyn to plan for a divorce.  She mentioned her intentions to coworkers, telling
06  them she intended to discuss divorce with Durall at a public location on the night of
    August 6, 1998.  She chose that date because the children would be staying with her
07  parents on Orcas Island.  If the discussion went badly, she planned to join the children
    there.

08
           At about 8:40 the evening of August 6, Carolyn's sister-in-law Anita Roberts
09  called the Durall residence.  She asked to speak to Carolyn, but Durall said she was
    sleeping.  Thinking that odd, Roberts asked Durall to check on her.  Carolyn
10  eventually came to the phone, but sounded unlike herself, speaking very slowly.
    Roberts asked what was wrong and Carolyn said Durall had fixed her a margarita.
11  This struck Roberts as remarkable since she had never known Durall to make Carolyn
    a drink.  Carolyn told Roberts everything was fine and she would call her in the
12  morning.

13         During the middle of the night, a neighbor heard a strange noise like a dull
    thud that caused him to go to his window that opened onto the cul de sac where the
14  Durall house was located, but he could not tell what made the sound or where it came
    from.

15
           The next morning, the usually punctual Carolyn did not arrive at work.
16  Concerned co-workers tried to locate her.  One of them, Kim Arruiza, drove by the
    Durall residence and saw Durall preparing to leave.  He appeared to be sweating and
17  nervous and said he did not know where Carolyn was.  The windows and blinds on
    the Durall residence were all shut, which was not how the house normally was kept.
18  Another coworker, Denise Jannush, called Durall to ask about Carolyn.  Durall told
    Jannush he last saw Carolyn when she headed to work that morning, and asked if
19  Carolyn had said anything the day before about wanting to have a serious conversion
    [sic] with Durall.  Jannush said no.  Durall also spoke with another of Carolyn's co-
20  workers, Sandra Lehning.  He told her he thought Carolyn had gone to work and said
    he was on his way to a work-related class in Fife.  One of Durall's co-workers,
21  Shayne Olsen, called the class in Fife and learned first that Durall had called in saying
    he would be late, and later that Durall did not attend the class.

22

REPORT AND RECOMMENDATION
PAGE -2

That evening, August 7, Durall filed a missing persons report with Renton police. He said Carolyn had left that morning and he expected her that evening. Durall also described Carolyn's missing van and said Carolyn had been involved with men through the internet, but he did not think she had left with another man on this occasion.

On August 8, Durall went to see his children at Carolyn's parents' house. Based on comments she later heard from the children, Carolyn's mother suspected Durall told them their mother ran away. Carolyn's friends and co-workers meanwhile organized search parties and posted flyers. That night, Carolyn's van was located a few miles from her home, locked, without signs of damage. Renton police left a message at the Durall house that the van had been located.

Just after midnight the following Monday, August 10, Durall called police and learned the van's location. A few hours later, a bus driver spotted the van swerving on Interstate 405. The bus driver said the van's driver had short dark hair. Durall's hair was short and dark; Carolyn's was long and blonde. A neighbor of the Durall's saw Durall return to his house later that morning in his Nissan Pathfinder. Later the same morning, Durall went to Carolyn's workplace and told two of her co-workers that Carolyn was not the cheery person they thought she was, that she was a bad mother and had been unfaithful to him. The same Monday, Durall purchased a gallon of a commercial carpet cleaner used for cleaning blood and other protein-based stains.

On Tuesday, August 11, Durall was interviewed by a Renton police detective. He suspected Carolyn had been seeing other men and said she might have left the area. He suggested her van might be near Sea-Tac airport. Two days later, the detective spoke with Durall again and said he would like to visit the Durall home. Durall said he was busy and would call back, but did not. The same day, Durall inquired of a pension services employee how long it would take to withdraw funds from his pension account and whether others could access it. When the employee said there was a possibility a spouse could access the account, Durall told him that was not an issue.

Within a few days, police searched the Durall home pursuant to a warrant. They discovered stains on the carpet, portions of the carpet that had been recently removed and replaced, bloodstains under the carpet and other stains consistent with blood in numerous locations. The position of the stains and furniture suggested the furniture had been rearranged since the blood was shed. Police also located Carolyn's van near the Sea-Tac airport. Although Carolyn's body had not been found, Durall was arrested and charged with second degree murder. Durall agreed to a police interview on August 11, at which he denied any knowledge about Carolyn's disappearance.

REPORT AND RECOMMENDATION
PAGE -3

On September 1, co-workers of Durall examined Durall's work computer and located temporary files reflecting search inquiries Durall had entered on the Internet in May and June including "kill + spouse," "accidental + death," "smothering," "poison," "homicide" and "murder." RP (7/19/2000) at 102-113, (7/24/2000) at 114-119. They also found on his computer information relating to an on-line dating service. In his file cabinet they found a list in Durall's handwriting including references to "bat," "gloves," "pillows," "footprints," "tire tracks" and "disposal." RP (7/19/2000) at 152-54.

Durall had met Sally Salsbury through the dating service. His information on the service, using the nickname "Freeedom," [sic] implied he was not married, but in his e-mails with Salsbury, he said he was in a troubled marriage, contemplating divorce, and concerned about custody of his children. RP (6/22/2000) at 35. Durall later met Salsbury in person for lunch a few times and discussed divorcing Carolyn. Salsbury recalled in particular Durall once saying "it brought tears to his eyes to think of not seeing his children every day and sometimes it seems easier if she was just dead." RP (6/22/2000) at 48. On another date he said he had a plan for resolving his marriage problems, but did not say what it was.

Considering this evidence of premeditation, the prosecution filed amended charges of first degree murder on September 4. On September 8, 1998, pursuant to an agreement negotiated between defense counsel – then John Henry Browne, Alan Ressler and Timothy Dole – and prosecutors, Durall led police to Carolyn's body. The State agreed not to seek to introduce at trial evidence relating to Durall's involvement in locating her body. The State later offered a recommendation of the mandatory minimum sentence of twenty years should Durall enter a guilty plea. Durall declined.

Over the months leading up to the trial, Durall was represented at various times by John Wolfe, Ressler, Dole and Browne, Richard Hansen, Michelle Shaw and finally Don Minor, who represented Durall at trial.

At trial, Durall testified that he last saw Carolyn alive on the morning of August 7. He went for a run and when he returned Carolyn was getting ready for work. When he came out of the shower, she was gone. Durall said he and Carolyn had gone to dinner the night before but there had been no talk of divorce. He testified that he did not go to the class in Fife because he felt poorly, and then, after talking to one of Carolyn's co-workers, he had spent the day looking for Carolyn's car in hotel parking lots where he suspected she might be meeting a man. When Durall returned home after visiting his children, he found a man with a gun in his bedroom. Durall was abducted and ordered to drive his car to a park, whether [sic] they met another man and Durall was ordered into a different car. The three then drove to Snoqualmie Pass where the two men left the car for a half hour to dispose of some bags from the

back of the car. Durall testified the man with the gun had said his partner "screwed up" and "[t]here wouldn't have been a problem, she should have kept her promise, but she got caught using the phone." RP (7/31/2000) at 161-62. Durall took these comments as references to Carolyn. The men took Durall back home and forced him to clean what was apparently blood on the carpet and the walls. Because of the men's threats and later phone calls he believed were from them, Durall did not tell police or anyone else about them. He suspected they had killed Carolyn.

Durall testified the files resulting from internet searches on his work computer were mere reflections of search engines tests he had been conducting based on a list of terms he had received for that purpose. The handwritten list was explained as merely relating to his son's baseball, property they had looked at purchasing, and items to remember to take on a trip. Although information he listed on the dating service and in e-mails to Salsbury and others said he was divorcing and looking for a long-term partner, that was not true, he only used such language to attract person to meet and exchange e-mails with. He denied telling Salsbury things would be easier if Carolyn were dead, did not recall telling her he had a plan to separate, and said that when he had told her that Carolyn was ugly on the inside, he had been lying.

At the conclusion of testimony, alternate jurors were identified and released, subject to recall if any seated jurors were excused. The jury deliberated and informed the court it had reached a decision, but before the verdict was disclosed to the court, the defense brought an allegation of juror misconduct. After a hearing, the court decided to replace one of the jurors because he had contact with a courthouse security officer who had improperly expressed his opinion of Durall's credibility. The verdict form used by that jury was sealed and eventually destroyed. The new jury eventually returned a guilty verdict. The court later imposed a 560-month exceptional sentence. (Dkt. No. 16, Ex. 16 at 1-6.)

Following sentencing, petitioner filed a direct appeal in the Washington Court of Appeals. The brief of appellant, prepared by petitioner's appellate counsel, challenged only petitioner's exceptional sentence. (*Id*., Ex. 4.) Petitioner, in a pro se supplemental brief, presented a number of additional challenges to the conviction itself. ( *Id*., Ex. 6.) The Court of Appeals affirmed petitioner's conviction and sentence in an unpublished opinion. (*Id*., Ex. 3.) Petitioner filed a pro se motion for reconsideration which was denied by the Court of Appeals. ( *Id*., Exs. 8 and 9.) Petitioner, through counsel, filed a petition for review in the Washington Supreme Court which

REPORT AND RECOMMENDATION
PAGE -5

01   was denied without comment.  (*Id.*, Ex. 11.)

02        Petitioner next filed a personal restraint petition in the Washington Court of Appeals in

03   which he presented challenges to both his conviction and his exceptional sentence.  (*Id.*, Ex. 13.)

04   The Court of Appeals dismissed the petition after finding that petitioner's claims failed to raise a

05   non-frivolous issue for review.  (*Id.*, Ex. 16.)

06        Petitioner thereafter sought discretionary review in the Washington Supreme Court.  (*Id.*,

07   Ex. 17.)  The Supreme Court Commissioner concluded that the acting chief judge of the Court

08   of Appeals had committed no obvious or probable error in dismissing petitioner's personal

09   restraint petition and, thus, denied the motion for discretionary review.  (*Id.*, Ex. 18.)  Petitioner

10   moved to modify the Commissioner's ruling, but that motion was also denied.  (*Id.*, Exs. 19 and

11   20.)  Petitioner now seeks federal habeas review of his conviction and sentence.

12   <u>GROUNDS FOR RELIEF</u>

13     Petitioner asserts the following ten grounds for relief in his federal habeas petition:

14   GROUND ONE: Petitioner was denied his 6th Amendment right to counsel by the
15   state's use of privileged conversations between Petitioner and his lawyer's investigator.

16   GROUND TWO: Petitioner was denied his right to a fair and impartial jury
17   guaranteed by the 6th and 14th Amendments by two separate incidents of jury tampering.

18   GROUND THREE: Petitioner was denied his 6th Amendment right to confrontation
19   as defined in *Crawford v. Washington*, by the state's use of numerous hearsay statements.

20   GROUND FOUR: Petitioner was deprived of his right to a fair and impartial jury
21   under the 6th and 14th Amendments as well as his 6th Amendment right to be present
      at all critical stages of the trial, by the trial court's decision to send the transcripts of
22   his suppression hearing to the jury room during deliberations.

REPORT AND RECOMMENDATION
PAGE -6

GROUND FIVE: Petitioner was denied his 5th Amendment right to effective assistance of counsel by failing to obtain a plea agreement prior to turning over incriminating evidence.

GROUND SIX: Petitioner was denied his rights to due process under the 5th and 14th Amendment of the US Constitution and his right to effective assistance of counsel under the 5th Amendment when an agreement between his attorneys and the state was changed without his knowledge.

GROUND SEVEN: The state violated petitioner's constitutional rights protected under the 4th and 5th Amendments by eliciting testimony that he failed to return detective's phone call, refused a warrant-less search and hired an attorney prior to his arrest.  Prosecutorial misconduct also violated the due process clause of the 5th and 14th Amendments.

GROUND EIGHT: Petitioner was placed in double jeopardy in violation of the 5th Amendment of the U.S. Constitution by the fact his jury reached two verdicts.

GROUND NINE: Trial court's imposition of a sentence 20 years above the maximum based on unproven facts, violated Petitioner's 6th Amendment right to have a jury determine all facts that increase punishment and conflicts with the U.S. Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

GROUND TEN: The trial court's use of prior incidents, that were not proven to be true by a clear and convincing standard violated Petitioner's 5th and 14th Amendment rights to due process and conflicts with *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 91 L.Ed.[sic] (1986).

(*See* Dkt. No. 4.)

## DISCUSSION

Respondent concedes in his answer to the petition that petitioner has fully exhausted his first, second, third, fourth, fifth, seventh, eighth and ninth grounds for federal habeas relief. Respondent also concedes that petitioner has properly exhausted a portion of his sixth ground for relief.  Specifically, respondent concedes that petitioner properly exhausted the ineffective assistance of counsel portion of his sixth ground for relief, but asserts that petitioner failed to

REPORT AND RECOMMENDATION
PAGE -7

01  properly exhaust the due process portion of that claim because he failed to argue that claim in the

02  Washington Supreme Court.  Respondent also asserts that petitioner failed to properly exhaust

03  his tenth ground for relief because he failed to present that claim to the Court of Appeals before

04  presenting it to the Washington Supreme Court for review.

05       As to the exhausted claims, respondent asserts that two of petitioner's grounds for relief,

06  grounds one and four, fail to state a federal constitutional claim.  Respondent asserts that the seven

07  remaining exhausted claims are without merit.  As to the unexhausted claims,  respondent asserts

08  that those claims are now procedurally barred.

09                                        Exhaustion

10       The United States Supreme Court has made clear that state remedies must first be

11  exhausted on all issues raised in a federal habeas corpus petition.  *Rose v. Lundy*, 455 U.S. 509

12  (1982); 28 U.S.C. §2254(b), (c).  Exhaustion must be shown either by providing the highest state

13  court with the opportunity to rule on the merits of the claim or by showing that no state remedy

14  remains available.  *Johnson v.  Zenon*, 88 F.3d 828, 829 (9th Cir. 1996)(citations omitted).  The

15  exhaustion requirement is a matter of comity, intended to afford the state courts "the first

16  opportunity to remedy a constitutional violation."   *Sweet v. Cupp*, 640 F.2d 233, 236 (9th Cir.

17  1981).

18       A federal habeas petitioner must provide the state courts with a fair opportunity to apply

19  controlling legal principles to the facts bearing on his constitutional claim.  *Picard v. Connor*, 404

20  U.S. 270 (1971); *Anderson v. Harless*, 459 U.S. 4 (1982).  Presenting a new claim to the state's

21  highest court in a procedural context in which its merits will not be considered absent special

22  circumstances does not constitute fair presentation of the claim for exhaustion purposes.  *Roettgen*

01   *v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994), *citing Castille v. Peoples*, 489 U.S. 346, 351 (1989).

02   Respondent argues that petitioner failed to properly exhaust the due process portion of his

03   sixth ground for relief, and the entirety of his tenth ground for relief.   Petitioner argues that his

04   sixth ground for relief must be deemed properly exhausted because he asked the Supreme Court

05   to review his original personal restraint petition which included a full argument regarding due

06   process during plea negotiations.   However, the Supreme Court will generally not consider issues

07   that are not properly argued in a petition for review, including issues and argument incorporated

08   by reference to lower court briefs.   *See Saldin Securities, Inc. v. Snohomish County*, 134 Wn.2d

09   288, 297 n. 4 (1998).   Because petitioner failed to present any argument to the Supreme Court

10   with respect to the due process portion of his sixth ground for relief, that claim was presented to

11   the Washington Supreme Court in a procedural context in which the merits would not be

12   considered absent special circumstances, and, thus, the claim has not been properly exhausted in

13   the state courts.   *See Castille*, 489 U.S. at 351.

14   With respect to his tenth ground for relief, petitioner concedes that he did not fully develop

15   the argument contained therein in the Court of Appeals, or cite to the United States Supreme

16   Court case which he relied upon to support that claim in his petition for review,   *McMillan v.*

17   *Pennsylvania*, 477 U.S. 79 (1986).   (*See* Dkt. No. 17 at 4.)   He argues, however, that that fact

18   alone would not prevent the Washington Supreme Court from addressing the claim because "[t]he

19   concepts enumerated within the due process claim are certainly discussed in *Apprendi* and are an

20   extension of that same argument."   (*Id.*)   This argument suggests that petitioner actually relied on

21   *Apprendi* in arguing his sentencing claims to the Court of Appeals on direct appeal.   However,

22   neither the brief of  appellant prepared by petitioner's appellate counsel nor petitioner's pro se

REPORT AND RECOMMENDATION
PAGE -9

01  supplemental brief asserts any claim based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

02        And, in fact, a review of the record reveals that when petitioner attempted to raise his

03  *Apprendi* and *McMillan* claims in his petition for review on direct appeal, the Supreme Court

04  struck those claims, on motion of the state, because the arguments had not been raised in the

05  Court of Appeals.  (Dkt. No. 16, Exs. 10B and 11.)  It is therefore abundantly clear from the

06  record that petitioner's tenth ground for relief was not presented to the Washington Supreme

07  Court in a procedural context in which the merits would be considered.  Accordingly, that claim

08  has not been properly exhausted.

09        When a petitioner fails to exhaust his state court remedies and the court to which petitioner

10  would be required to present his claims in order to satisfy the exhaustion requirement would now

11  find the claims to be procedurally barred, there is a procedural default for purposes of federal

12  habeas review.  *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991).

13        Respondent argues that petitioner, having failed to properly exhaust the due process

14  portion of his sixth ground for relief, and the entirety of his tenth ground for relief, would now be

15  barred from presenting those claims to the state courts under RCW 10.73.090, and other

16  provisions of state law.  RCW 10.73.090(1) provides that a petition for collateral attack on a

17  judgment and sentence in a criminal case must be filed within one year after the judgment becomes

18  final.  A judgment becomes final for purposes of state collateral review on the date that the

19  appellate court issues its mandate disposing of a timely direct appeal. RCW 10.73.090(3)(b). The

20  Court of Appeals issued its mandate terminating petitioner's direct appeal on February 23, 2004.

21  (*See* Dkt. No. 16, Ex. 12.)  Petitioner would therefore be time barred from presenting his

22  unexhausted claims to the state courts.

REPORT AND RECOMMENDATION
PAGE -10

01    Accordingly, this Court concludes that petitioner has procedurally defaulted on the due

02 process portion of his sixth ground for relief, and on his tenth ground for relief. When a state

03 prisoner defaults on his federal claims in state court, pursuant to an independent and adequate

04 state procedural rule, federal habeas review of the claims is barred unless the prisoner can

05 demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal

06 law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of

07 justice. *Coleman v. Thompson*, 501 U.S. at 750. Petitioner makes no attempt to demonstrate

08 cause and prejudice for his procedural default. Accordingly, this Court concludes that neither the

09 due process portion of petitioner's sixth ground for relief, nor petitioner's tenth ground for relief,

10 are eligible for federal habeas review. Petitioner's federal habeas petition should therefore be

11 dismissed with respect to those two claims.

12                                    Standard of Review for Exhausted Claims

13    Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition may

14 be granted with respect to any claim adjudicated on the merits in state court only if the state

15 court's decision was *contrary to*, or involved an *unreasonable application* of, clearly established

16 federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable

17 determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d) (emphasis

18 added).

19    Under the "contrary to" clause, a federal habeas court may grant the writ only if the state

20 court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law,

21 or if the state court decides a case differently than the Supreme Court has on a set of materially

22 indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362 (2000). Under the "unreasonable

01  application" clause, a federal habeas court may grant the writ only if the state court identifies the

02  correct governing legal principle from the Supreme Court's decisions but unreasonably applies that

03  principle to the facts of the prisoner's case. *Id*. The Supreme Court has made clear that a state

04  court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer*

05  *v. Andrade*, 538 U.S. 63, 69 (2003).

06  <u>Ground One: Use of Privileged Communications</u>

07        Petitioner asserts in his first ground for relief that he was denied his Sixth Amendment right

08  to counsel when the state was permitted to introduce, over objection, notes and testimony from

09  an investigator hired by petitioner's attorney. At issue here are notes of conversations petitioner

10  had with investigator Roger Dunn who had been hired by attorney John Wolfe prior to petitioner's

11  arrest. These notes were introduced at trial by the prosecution during its cross-examination of

12  petitioner.

13        In his personal restraint proceedings, the Court of Appeals rejected the claim that the state

14  violated his right to counsel by cross-examining him about his use of a private investigator after

15  his wife disappeared. (Dkt. No. 16, Ex. 16 at 7-8.) The Court of Appeals noted that the question

16  of attorney-client privilege was not of constitutional dimension and that "[b]y not objecting or

17  otherwise raising this nonconstitutional issue at trial, Durall failed to preserve it for review in this

18  collateral attack." (*Id*.)

19        The Supreme Court rejected the claim as well:

20        Mr. Durall first argues that the State violated his attorney-client privilege by
       examining him about his use of a private investigator after his wife's disappearance.

21     But this claim was decided against Mr. Durall on direct appeal. He therefore must
       demonstrate that the interests of justice require reconsideration of the issue. *In re*

22     *Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994). Mr. Durall urges

REPORT AND RECOMMENDATION
PAGE -12

01  that the issue should be reexamined because on direct appeal the Court of Appeals
02  mistakenly believed that he, rather than his attorney, had hired the investigator.  He
now presents an affidavit from one of his former attorneys stating that the attorney
03  had hired the investigator.  But even if that is the case, the acting chief judge correctly
observed that the attorney-client privilege is not of constitutional dimension.  *See*
04  *State v. Pawlyk*, 115 Wn.2d 457, 469, 800 P.2d 338 (1990); *United States v. Mett*,
178 F.3d 1058, 1066 (9th Cir. 1999).  Mr. Durall therefore waived the issue by not
objecting at trial.  *State v. Davis*, 141 Wn.2d 798, 850, 10 P.3d 977 (2000).  And
05  even if the attorney-client privilege had constitutional magnitude, Mr. Durall fails to
06  show, in light of the voluminous evidentiary record, that he was actually and
substantially prejudiced by the claimed error.  *See Lord*, 123 Wn.2d at 303.  Mr.
07  Durall therefore does not demonstrate that the interests of justice require
reconsideration of this issue.

08  (*Id.*, Ex. 18 at 1-2.)

09          Petitioner disputes the conclusion of the state courts that the attorney-client privilege is

10  not of constitutional dimension.  Petitioner appears to concede that a breach of the attorney-client

11  privilege is not a per se constitutional violation, but argues that it can rise to the level of a

12  constitutional violation in certain circumstances.  Petitioner contends that the circumstances

13  presented in this case rise to the level of a constitutional violation because he was clearly

14  prejudiced by the prosecutor's use of the protected conversations.  In fact, petitioner makes no

15  showing that he was prejudiced by the use of the investigators notes.

16          The standard for determining whether relief must be granted on federal habeas review is

17  whether any claimed error "had a substantial and injurious effect or influence in determining the

18  jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (quoting *Kotteakos v. United*

19  *States*, 328 U.S. 750, 776 (1946)).  In this case, the Washington State Supreme Court concluded

20  that petitioner had not shown, in light of the voluminous evidentiary record, that he was actually

21  and substantially prejudiced by the claimed error.  This Court has thoroughly reviewed the record

22  and concurs that, even assuming petitioner could establish an error of constitutional dimension,

REPORT AND RECOMMENDATION
PAGE -13

01    petitioner has not established that such an error had a substantial and injurious effect on

02    determining the jury's verdict. Accordingly, petitioner's federal habeas petition should be denied

03    with respect to his first ground for relief.

04    <u>Ground Two: Juror Misconduct</u>

05    Petitioner asserts in his second ground for relief that he was denied his right to a fair and

06    impartial jury, as guaranteed by the Sixth and Fourteenth Amendments, by two separate incidents

07    of jury tampering. The first incident involved a uniformed court security officer who confronted

08    one of the jurors as he was entering the courthouse and made comments to the juror expressing

09    his opinion about petitioner's guilt. That incident occurred on the morning of August 4, 2000.

10    The jury reached a verdict later that same day. However, the court declined to take the verdict

11    and, in fact, that original verdict was subsequently destroyed without ever being read. The second

12    incident involved a brief remark made about the trial to a juror by one of his relatives. That

13    incident occurred on the evening of August 4, 2000, after the original verdict was reached and

14    before the jury reconvened with an alternate juror three days later.

15    It is well established that a criminal defendant has a right to a trial before "a panel of

16    impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961). Where allegations

17    of juror impartiality are made, the remedy is to provide "a hearing in which the defendant has the

18    opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). The Supreme

19    Court, in *Smith*, explained that "due process does not require a new trial every time a juror has

20    been placed in a potentially compromising situation." *Id*. at 217. Rather, "[d]ue process means

21    a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever

22    watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when

REPORT AND RECOMMENDATION
PAGE -14

01  they happen." *Id.*

02      The burden is on the defendant to establish that a juror lacks impartiality. *See Wainwright*

03  *v. Witt*, 469 U.S. 412, 423 (1985). In evaluating a claim of juror impartiality, deference must be

04  paid to a state trial judge's determination of bias. *See Wainwright*, 469 U.S. at 426. As the Court

05  noted in *Wainwright*, a finding on whether a juror is biased "is based upon determinations of

06  credibility that are peculiarly within a trial judge's province." *Id.* at 428. Such determinations

07  regarding juror impartiality constitute "factual issues" which are subject to the presumption of

08  correctness set forth in § 2254(e)(1). *See Wainwright*, 469 U.S. at 429.

09      The Washington Court of Appeals rejected petitioner's juror misconduct claim on direct

10  appeal. The Court of Appeals explained its conclusion as follows:

11          Durall next claims that a mistrial should have been granted due to juror
        misconduct. During jury deliberations, an attorney visiting the courthouse overheard
12      an extended conversation between a security officer and a juror who was passing
        through the security area. In that conversation, the officer lectured the juror about
13      his impressions of Durall's overwhelming guilt. The attorney alerted the trial judge,
        who then questioned the juror.

14

15          Initially, the juror denied the contact, but he then admitted it, explaining that
        he had not paid much attention to the conversation. The trial court found credible his
16      statements that the comments did not impact him. Further, his statement that he did
        not discuss these comments with the other jurors was corroborated by the other
        jurors. The trial court also asked the other jurors if they had had any improper
17      contacts during trial and discovered that a juror had heard a cousin make a brief but
        incomplete remark consisting of "A couple of guys," "Killed wife and he is guilty."
18      After completing its individual questioning of all jurors, the trial court denied
        defendant's motion for mistrial but granted defense counsel's request to substitute the
19      first juror with an alternate. The trial court retained the second juror, however, due
        to the brevity of his cousin's remark, its internal inconsistencies, and the juror's
20      credible assertion that he could and would disregard it. The court then instructed the
        jury to begin deliberations anew.

21

22          On appeal, Durall speculates that all of the excused juror's deliberations with
        fellow jurors (about one-half day) following the improper contact were influenced by

REPORT AND RECOMMENDATION
PAGE -15

01  the improper contact and that the security officer in question had likely attempted to
    influence jurors on other occasions during trial.  He also contends that the disruption
02  and individual questioning during deliberations necessarily prejudiced the jury against
    him.  In response, the State claims that Durall has not met his burden of showing juror
03  misconduct under State v. Balisok, 123 Wn.2d 114-117-18, 866 P.2d 631 (1994),
    which places on the defendant the burden of showing "[a] strong, affirmative showing
04  of misconduct" to "overcome the policy favoring stable and certain verdicts. . . ."
    The State is correct.

05
    The trial court acted appropriately by thoroughly and impartially questioning
06  all jurors, immediately replacing the only juror who was arguably tainted by the
    security guard's comments, and instructing the jury to begin deliberations anew.
07  There is nothing in the record to show that the juror prejudiced deliberations before
    his removal or that the security guard made inappropriate comments on other
08  occasions to other jurors.  Durall's speculation about misconduct or tampering that
    might have occurred is not sufficient to meet his burden.

09

10  (Dkt. No. 16, Ex. 3 at 12-14.)

11  Petitioner argues that the decision of the Washington Court of Appeals with respect to this

12  issue conflicts with United States Supreme Court precedent because the Court of Appeals placed

13  the burden of proving prejudice on petitioner.  Petitioner asserts that once jury tampering has

14  occurred, the burden falls on the state to prove that it was harmless beyond a reasonable doubt.

15  Petitioner relies on the United States Supreme Court's decision in *Remmer v. United States*, 347

16  U.S. 227 (1954) to support his claim.

17  In *Remmer*, one of the jurors had been contacted by a third party during trial and the juror

18  was told that he could profit from bringing in a verdict favorable to the defendant.  *Remmer*, 347

19  U.S. at 228.  The juror reported the contact to the trial judge who alerted the prosecution but not

20  the defense.  *Id*.  The trial judge requested that the Federal Bureau of Investigation investigate the

21  incident and provide a report.  *Id*.  The judge and prosecutors considered the report and

22  "apparently concluded that the statement to the juror was made in jest."  *Id*.  The Supreme Court

REPORT AND RECOMMENDATION
PAGE -16

01  held that under these circumstances the defendant was entitled to a hearing to determine the effect

02  of the remark and the subsequent FBI investigation on the jury and to determine whether the

03  defendant had been prejudiced. *Id*. at 229. In reaching that conclusion, the Supreme Court

04  explained that such contact was deemed presumptively prejudicial and that the burden rested with

05  the government to establish, after notice and a hearing, that the improper contact was not harmless

06  to the defendant. *Id*.

07          However, the *Remmer* presumption of prejudice has by and large been limited in its

08  application to cases involving juror tampering. *See U.S. v. Dutkel*, 192 F.3d 893, 895-96 (9th Cir.

09  1999). Petitioner's case did not involve juror tampering of the sort discussed by the Supreme

10  Court in *Remmer*. Petitioner's case, at most, involved an instance of improper juror contact.

11  Thus, the burden was properly placed on petitioner to show prejudice. *See Dutkel*, 192 F.3d at

12  895-96.

13          The record before this Court confirms that the trial court, consistent with federal law,

14  thoroughly questioned jurors to assess the impact that the improper contact had on them. (*See*

15  Dkt. No. 16, Ex. 55.) This questioning revealed that only one of the jurors was confronted by the

16  court security officer, and that that juror revealed nothing about the incident to his fellow jurors.

17  At the request of petitioner's counsel, the trial court agreed to dismiss the juror who had been

18  confronted by the security officer even though the court found credible that juror's statements that

19  he was not influenced by the contact. (*See* Dkt. No. 16, Ex. 55 at 64-66.) The trial court likewise

20  found credible the statements of the juror involved in the second incident that he could and would

21  disregard the comments of his relative. (*Id*., Ex. 55 at 62-64.) These findings of the trial court

22  are entitled to a presumption of correctness. *See Wainwright*, 469 U.S. at 429.

01    The Washington Court of Appeals, based on this record, reasonably concluded that

02 petitioner had not met his burden of showing misconduct.  And, petitioner certainly has not met

03 his burden of demonstrating the degree of prejudice which would entitle him to relief on federal

04 habeas review.  *See Brecht*, 507 U.S. at 638.  Accordingly, petitioner's federal habeas petition

05 should be denied with respect to his second ground for relief.

06    <u>Ground Three: Confrontation Clause</u>

07    Petitioner asserts in his third ground for relief that he was denied his right to confront

08 witnesses against him in violation of his Sixth Amendment right as defined by the United States

09 Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004).  At issue in this claim are out-of-

10 court statements which the victim made to friends, co-workers, and family members about her plan

11 to talk to petitioner about a divorce on the night she was murdered.  These statements were

12 admitted under an exception to the hearsay rule as statements of future intent.  (*See* Dkt. No. 16,

13 Ex. 23 at 79-80.)

14    The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

15 prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

16 him." U.S. Const. Amend. VI.  In *Ohio v. Roberts* , 448 U.S. 56 (1980), the United States

17 Supreme Court held that the Confrontation Clause does not bar the admission of an out-of-court

18 statement of an unavailable witness so long as the statement bears "adequate indicia of reliability."

19 *Id*. at 66.  Under *Roberts*, an out-of-court statement meets the reliability test if it falls within a

20 "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness*." Id*.

21 Where evidence falls within a firmly rooted hearsay exception, reliability can be inferred.  *Id*.

22    In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court partially abrogated

REPORT AND RECOMMENDATION
PAGE -18

01 *Roberts*.  The Court, in *Crawford*, drew a distinction between testimonial and non-testimonial

02 hearsay, and rejected the *Roberts* test as to testimonial hearsay statements.  As to testimonial

03 hearsay statements, the Court held that such statements are barred under the Confrontation Clause

04 unless the declarant is unavailable and the defendant had prior opportunity to cross-examine the

05 declarant.  *Id*. at 68-69.

06          The Supreme Court did not spell out a comprehensive definition of "testimonial" in

07 *Crawford*, but did note that "testimony . . . is typically a solemn declaration or affirmation made

08 for the purpose of establishing or proving some fact." *Id*. at 51.  The Court went on to distinguish

09 "a formal statement to government officers" from "a casual remark to an acquaintance." *Id*.  The

10 Court suggested that the former type of statement constitutes testimony whereas the latter does

11 not.

12          On review of petitioner's personal restraint petition, in which petitioner specifically raised

13 the Confrontation Clause issue under *Crawford*, the Washington Supreme Court concluded that

14 statements made by the victim to co-workers and relatives about her plan to discuss divorce with

15 petitioner could not be deemed testimonial "under any reasonable reading of *Crawford*."  (Dkt.

16 No. 16, Ex. 18 at 3-4.)  While petitioner argues vigorously that the statements at issue should be

17 deemed testimonial, petitioner makes no showing that the decision of the Washington Supreme

18 Court was either contrary to, or constituted an unreasonable application of, clearly established

19 federal law  Accordingly, petitioner's federal habeas petition should be denied with respect to his

20 third ground for relief.

21                         Ground Four: Admission of Transcripts

22          Petitioner asserts in his fourth ground for federal habeas relief that he was denied his Sixth

01  Amendment right to a fair and impartial jury and to be present at all critical stages of the trial when

02  the trial court allowed transcripts of petitioner's suppression hearing to go to the jury room during

03  deliberations.  While petitioner frames this issue as one implicating federal constitutional concerns,

04  in his pro se supplemental brief on direct appeal he argued only that the trial court had abused its

05  discretion when it admitted into evidence petitioner's testimony from his CrR 3.5 hearing.  (*See*

06  Dkt. No. 16, Ex. 6 at 9-11.)  In his subsequent petition for review, petitioner's counsel argued that

07  the admission of the testimony implicated federal constitutional concerns.  (*Id.*, Ex. 10A at 22-26.)

08      The Washington Court of Appeals, when considering the issue as it was presented in

09  petitioner's pro se brief, concluded that the trial court did not abuse its discretion in permitting the

10  jury to consider the transcripts of the CrR 3.5 hearing.  (Dkt. No. 16, Ex. 3 at 10.)  The

11  Washington Supreme Court denied petitioner's petition for review without comment and therefore

12  did not discuss the merits of petitioner's constitutional claim.

13      Despite petitioner's efforts to frame his fourth ground for relief as a federal constitutional

14  claim, the trial court's decision to allow the jury to consider the transcripts of his 3.5 hearing is

15  essentially a state law claim.  And, federal habeas relief does not lie for errors of state law.  *Lewis*

16  *v. Jeffers*, 497 U.S. 764, 780 (1990)(citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)).  It is not

17  the province of federal habeas courts to re-examine state court conclusions regarding matters of

18  state law.  *Estelle v. McGuire*, 502 U.S. 62 (1991); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th

19  Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994).  Claims that evidence was improperly admitted

20  in a state court trial are cognizable in habeas corpus proceedings "only when admission of the

21  evidence violated the defendant's due process rights by rendering the proceedings fundamentally

22  unfair."  *Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir. 1994) (citing *Jammal v. Van de Kamp*, 926

REPORT AND RECOMMENDATION
PAGE -20

01 | F.2d 918, 919 (9th Cir. 1991)). When considering whether erroneously admitted evidence

02 | rendered a trial fundamentally unfair, the federal habeas court must determine whether the error

03 | "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* 507

04 | U.S. at 638.

05 | Petitioner makes no showing that the admission of limited portions of the suppression

06 | hearing transcripts rendered his trial fundamentally unfair. Accordingly, petitioner's federal habeas

07 | petition should be denied with respect to his fourth ground for relief.

08 | Grounds Five and Six: Ineffective Assistance of Counsel

09 | Petitioner asserts in his fifth ground for federal habeas relief that he was denied his right

10 | to effective assistance of counsel when his counsel failed to obtain a plea agreement prior to

11 | petitioner turning over incriminating evidence. Petitioner asserts in his sixth ground for relief that

12 | he was denied his right to effective assistance of counsel when an agreement between his attorneys

13 | and the state prosecutors was changed without his knowledge.

14 | The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

15 | counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Claims of ineffective assistance

16 | of counsel are evaluated under the two-prong test set forth in *Strickland*. Under *Strickland*, a

17 | defendant must prove (1) that counsel's performance fell below an objective standard of

18 | reasonableness and, (2) that a reasonable probability exists that, but for counsel's error, the result

19 | of the proceedings would have been different. *Strickland*, 466 U.S. at 688, 691-92.

20 | When considering the first prong of the *Strickland* test, judicial scrutiny must be highly

21 | deferential. *Strickland*, 466 U.S. at 689. There is a strong presumption that counsel's

22 | performance fell within the wide range of reasonably effective assistance. *Id*. The Ninth Circuit

01   has made clear that "[a] fair assessment of attorney performance requires that every effort be made

02   to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

03   challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

04   *Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

05        The second prong of the *Strickland* test requires a showing of actual prejudice related to

06   counsel's performance.  The petitioner must demonstrate that it is reasonably probable that, but

07   for counsel's errors, the result of the proceedings would have been different.  The reviewing Court

08   need not address both components of the inquiry if an insufficient showing is made on one

09   component.  *Strickland*, 466 U.S. at 697.  Furthermore, if both components are to be considered,

10   there is no prescribed order in which to address them.  *Id*.

11        **1.        *Failure of Counsel to Obtain Plea Agreement***

12        Petitioner faults counsel for failing to obtain a plea agreement before petitioner turned over

13   incriminating evidence to the state.  Petitioner maintains that his counsel came to him in the early

14   stages of the criminal proceedings and represented to him that the state would accept a plea of

15   guilty to second degree murder, and make a sentencing recommendation of 10 years, in exchange

16   for petitioner's assistance in locating his wife's body.  Petitioner contends that counsel rendered

17   ineffective assistance when he failed to get this agreement in writing before petitioner rendered his

18   assistance to the state.

19        The Washington Court of Appeals rejected this claim in petitioner's personal restraint

20   proceedings, concluding that petitioner had shown neither deficient performance nor prejudice.

21   (*See* Dkt. No. 16, Ex. 16 at 8-11.)  The Washington Supreme Court agreed with the conclusion

22   of the Court of Appeals.  The Supreme Court explained its conclusion as follows:

REPORT AND RECOMMENDATION
PAGE -22

01      Mr. Durall next argues that his original counsel, John Henry Browne, was
ineffective in failing to secure a written plea offer before Mr. Durall agreed to disclose
02 to authorities the location of his wife's body. But Mr. Durall does not show that the
State had even orally offered a plea bargain in exchange for his cooperation. As the
03 acting chief judge noted, the letter drafted to memorialize the actual agreement on the
recovery of the body made no mention of a plea agreement. Mr. Durall did obtain a
04 considerable concession from the State in [the] form of an agreement not to introduce
at trial any evidence of Mr. Durall's involvement in the recovery. Moreover, the State
05 ultimately offered Mr. Durall a plea bargain recommending the minimum 20-year
sentence, 340 months less than the sentence he ultimately received. Mr. Durall asserts
06 that Mr. Browne discussed disclosing the location of his wife's body in exchange for
a "few years." But Mr. Durall does not demonstrate with affidavits either from Mr.
07 Browne or from anyone else involved in the disclosure agreement that Mr. Browne
said any such thing. In the absence of such affidavits, Mr. Durall fails to make a
08 sufficient factual showing that Mr. Browne's representation was constitutionally
deficient. *See In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086
09 (1992). Nor does he demonstrate that the acting chief judge erred in finding no
prejudice in light of all of the evidence.

10

11 (Dkt. No. 16, Ex. 18 at 2-3.)

12      Petitioner challenges the conclusions of the state courts, but makes no showing that those

13 conclusions were objectively unreasonable. Petitioner argues that whether the prosecution actually

14 offered a deal for a plea to second degree murder and a recommendation for a 10 year sentence

15 is immaterial. He contends that counsel should have at least secured a written agreement of what

16 was to be given in exchange for his assistance in locating his wife's body. In fact, counsel did

17 secure such an agreement. That agreement provided that the state would not seek to introduce

18 at trial any information relating to petitioner's involvement in the discovery's of his wife's body,

19 and the agreement was memorialized in a letter dated September 8, 1998. (*See* Dkt. No. 16, Ex.

20 13, Appendix C.) The letter made no reference to a plea agreement of any sort.

21      It was only after petitioner rendered his assistance that the prosecutor, believing petitioner

22 deserved some leniency for leading police to the body of his wife, communicated to defense

REPORT AND RECOMMENDATION
PAGE -23

01  counsel that he was willing to accept a guilty plea to the charge of murder in the first degree with

02  a recommendation of the mandatory minimum twenty year sentence.  (*See id.*, Ex. 14, Appendix

03  H.)  Petitioner rejected that offer, apparently against the advice of defense counsel.  (        *Id.*)

04  According to the prosecutor, that was the only offer ever tendered to petitioner. (*Id.*)  While it

05  is certainly conceivable that petitioner's counsel encouraged him to cooperate with the state in

06  hopes of obtaining some leniency, nothing in the record demonstrates that counsel made any

07  misrepresentations to petitioner about possible plea offers.

08          Petitioner has not demonstrated that his counsel's performance was deficient nor has he

09  established, in any event, that he was prejudiced by the alleged misconduct.  The decision of the

10  state courts was reasonable, and was entirely consistent with federal law.    Accordingly,

11  petitioner's federal habeas petition should be denied with respect to his fifth ground for relief.

12          ***2.      Alteration of Agreement***

13          Petitioner also faults counsel for permitting changes to be made to the September 8, 1998,

14  agreement between his attorney and the prosecutors regarding petitioner's assistance in locating

15  his wife's body without his knowledge or consent.  The agreement, as originally drafted, provided

16  in relevant part that "the State has agreed not to seek to introduce at trial or to publicize

17  beforehand any information relating to Mr. Durall's involvement in the discovery of the body of

18  his wife."  (Dkt. No. 16, Ex. 13, Appendix C.)  That agreement was subsequently modified to

19  strike the phrase "or to publicize beforehand" and to add the sentence "If, however, the defense

20  introduces such information in any court proceeding, the State is no longer bound by the

21  provisions of this agreement."  ( *Id.*)  These modifications were agreed to by counsel for both

22  parties.  Petitioner contends that his attorney, in agreeing to these modifications, failed to protect

REPORT AND RECOMMENDATION
PAGE -24

01 his interests.

02     The state courts rejected this ineffective assistance of counsel claim in petitioner's personal

03 restraint proceedings.  The Court of Appeals concluded that petitioner's claim as to the letter was

04 frivolous.  (Dkt. No. 16, Ex. 16 at 12.)

05     The Washington Supreme Court also rejected the claim, explaining its reasoning as

06 follows:

07         Continuing with the discloure [sic] agreement, Mr. Durall asserts that the
        agreement was later altered, without his knowledge, to remove the requirement that
08      the State not publicly disclose his cooperation.  But he provides no affidavits fully
        explaining the circumstances of the alteration.  Nor does he demonstrate that he was
09      prejudiced by any pretrial publicity, that he would not have agreed to cooperate had
        he known that his cooperation might be made public, or that his lack of cooperation
10      likely would have changed the outcome of the trial.

11 (*Id.*, Ex. 18 at 3.)

12     Petitioner asserts in these proceedings that counsel had a duty to consult with him

13 regarding the changes to the agreement and suggests that he would not have entered into the

14 agreement with the state if he had known of the altered terms.  However, as noted by the state

15 courts, petitioner provides no affidavits or other evidence which might explain the circumstances

16 of the alteration nor does he demonstrate that the alteration in any way affected the ultimate

17 outcome of the proceedings.  Accordingly, petitioner's federal habeas petition should be denied

18 with respect to his sixth ground for relief.

19                 Ground Seven:  Prosecutorial Misconduct

20     Petitioner asserts in his seventh ground for federal habeas relief that the state violated his

21 rights under the Fourth and Fifth Amendments when the prosecutor improperly elicited testimony

22 that petitioner had failed to return a detective's phone call, had refused a warrantless search, and

REPORT AND RECOMMENDATION
PAGE -25

01  had hired an attorney prior to his arrest.

02      When a prosecutor's conduct is placed in question, the standard of review is the "narrow

03  one of due process, and not the broad exercise of supervisory power."    *Donnelly v.*

04  *DeChristoforo*, 416 U.S. 637, 642 (1974).  This Court cannot issue a writ of habeas corpus to

05  state authorities unless the prosecutor's conduct "so infected the trial with unfairness as to make

06  the resulting conviction a denial of due process." *Id.* at 643; *Darden v. Wainwright*, 477 U.S. 168,

07  181 (1986).  In order to assess a claim that a prosecutor's comments constitute a due process

08  violation, it is necessary to examine the entire proceedings and place the prosecutor's statements

09  in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).

10      The Washington Court of Appeals rejected petitioner's prosecutorial misconduct claims

11  on direct appeal.  The Court explained its reasoning as follows:

12      Durall's remaining prosecutorial misconduct arguments lack merit.  The
    prosecutor did not infringe on Durall's right to refuse consent to a warrantless search
13  when a detective testified regarding a telephone call he had with Durall.  In that call,
    the detective told Durall he would like to visit the Durall home, but Durall said he was
14  busy and would call him back.  The detective testified that Durall did not call him
    back.

15

16      Merely referring to the defendant's failure to call back does not violate a
    constitutional right.  <u>State v. Sweet</u>, 138 Wn.2d 466, 481, 980 P.2d 1223 (1999).
17  There was no testimony that Durall refused the search or refused to talk with the
    detective.  Accordingly, his constitutional right to remain silent was not violated.
18  Durall's additional claim that the State inferred guilt from his postarrest silence is too
    vague to address–it contains no citations to the record or pertinent analysis.

19      There is also no merit to Durall's claim that the State violated his Sixth
    Amendment right to counsel when it introduced evidence that he retained an attorney
20  before his arrest.  It is not permissible for a prosecutor to imply guilt from the hiring
    of an attorney–such actions are irrelevant to the question of guilt or innocence and are
21  therefore inadmissible.  <u>See</u> <u>Bruno v. Rushen</u>, 721 F.2d 1193, 1194 (9th Cir. 1983).
    There is no evidence, however, that the prosecutor even made such an inference.  The
22  fact that Durall had hired an attorney was raised by Durall himself to explain his

REPORT AND RECOMMENDATION
PAGE -26

01      inquiries about withdrawing money from his pension plan. Durall has failed to identify
any comment in the record stating or implying that he had hired an attorney before his
02      arrest because he was guilty.

03  (Dkt. No. 16, Ex. 3 at 17.)

04        While petitioner frames his seventh ground for relief as a prosecutorial misconduct claim,

05  respondent suggests in his answer to the petition that the claim is more properly construed as an

06  admission of evidence claim. As the testimony at issue here was admitted only after favorable

07  evidentiary rulings by the trial court, respondent's assessment of the issue appears correct.

08  However, regardless of whether the claim is characterized as a prosecutorial misconduct claim or

09  as a claim challenging the trial court's evidentiary rulings, federal habeas relief can be granted only

10  if petitioner establishes that the alleged errors "'had substantial and injurious effect or influence in

11  determining the jury's verdict.'" *Brecht*, 507 U.S. at 638. Petitioner makes no such showing.

12  Accordingly, petitioner's federal habeas petition should be denied with respect to his seventh

13  ground for relief.

14  Ground Eight: Double Jeopardy

15        Petitioner asserts in his eighth ground for federal habeas relief that his rights under the

16  Double Jeopardy Clause were violated when the jury reached two verdicts. The first verdict was

17  reached on August 4, 2000, and was delivered to the trial judge. However, it was at that point

18  that potential juror misconduct issues came to light. After dealing with those issues, and seating

19  a replacement juror, the trial court sent the jury back to begin deliberations again, and the jury

20  returned another verdict. The original verdict, which was never read, was destroyed.

21        The Fifth Amendment to the United States Constitution guarantees that no person shall

22  "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend

REPORT AND RECOMMENDATION
PAGE -27

01  V.  The Double Jeopardy Clause protects against three distinct abuses:  a second prosecution for

02  the same offense after conviction, a second prosecution for the same offense after acquittal, and

03  multiple punishments for the same offense.  *Schiro v. Farley*, 510 U.S. 222, 229 (1994) (citing

04  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).  However, the Supreme Court has

05  recognized that "the protection of the Double Jeopardy Clause by its terms applies only if there

06  has been some event, such as an acquittal, which terminates the original jeopardy."  *Richardson*

07  *v. United States*, 468 U.S. 317, 325 (1984).

08          The Washington Supreme Court addressed this claim as follows:

09          Mr. Durall contends, next, that his double jeopardy rights were violated
        because the jury had reached a verdict before one of the jurors was excused, making
10      the ultimate verdict a second "conviction" for the same crime.  But as the acting chief
        judge noted, a jury's action does not become a verdict until it is finally rendered in
11      open court and received by a trial judge.  *State v. Robinson*, 84 Wn.2d 42, 46, 523
        P.2d 1192 (1974).  Although the first result may have been delivered to the trial judge
12      in a sealed envelope before the juror was excused, that result was never rendered in
        open court and filed.  Thus, the first result did not constitute a final verdict precluding
13      the jury from continuing deliberations with a substitute juror.  *State v. Wirth*, 121 Wn.
        App. 8, 13-14, 85 P.3d 922, *review denied*, 152 Wn.2d 1018 (2004).

14

15  (Dkt. No. 16, Ex. 18 at 4.)

16          The decision of the Washington Supreme Court was consistent with clearly established

17  federal law and was entirely reasonable.  Because the first verdict was never read, there was no

18  event which terminated the original jeopardy.  Thus, the second verdict cannot be deemed a

19  second jeopardy for purposes of the Double Jeopardy Clause.  Petitioner's federal habeas petition

20  should therefore be denied with respect to his eighth ground for relief.

21                          <u>Ground Nine: Sentencing</u>

22          Petitioner asserts in his ninth ground for relief that his exceptional sentence violates his

REPORT AND RECOMMENDATION
PAGE -28

01  right under the Sixth Amendment to have a jury determine all facts that increase punishment, and

02  conflicts with the United States Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466

03  (2000).  Petitioner notes that the standard range sentence for his offense of conviction was 240-

04  320 months, and that he received a sentence of 560 months, 20 years beyond the top end of the

05  standard range.

06       When petitioner presented this claim to the state courts in his personal restraint

07  proceedings, he argued that his exceptional sentence conflicted with the United States Supreme

08  Court's decisions in *Apprendi* and in *Blakely v. Washington*, 542 U.S. 296 (2004).  The state

09  courts rejected this claim on the grounds that the Supreme Court's decision in *Blakely* was issued

10  after petitioner's judgment and sentence became final in May 2004, and that *Blakely* therefore did

11  not apply to petitioner's case.  (*See* Dkt. No. 16, Ex. 16 at 16-17 and Ex. 18 at 4-5.)

12       Petitioner argues in these proceedings that *Apprendi* alone dictates the result in his case

13  because the Supreme Court clearly stated in *Apprendi* that a judge has the discretion to impose

14  a sentence within statutory limits and that "[i]t is now clear that when the    *Apprendi* Court

15  discussed a judge 'imposing a judgment within the range prescribed by statute,' they were talking

16  about the maximum a judge may impose without additional factual findings." (Dkt. No. 17 at 16.)

17  However, the interpretation of *Apprendi* which petitioner urges on this Court is the interpretation

18  given *Apprendi* by the *Blakely* court.  Based solely on  *Apprendi*, this Court would necessarily

19  conclude that petitioner's exceptional sentence did not violate constitutional principles because

20  his sentence did not exceed the maximum sentence provided by statute.  Petitioner's argument is

21  essentially an argument that *Blakely* should be applied retroactively to his case.

22       In *Schardt v. Payne*, 414 F.3d 1025 (9th Cir. 2005), the Ninth Circuit held that the

REPORT AND RECOMMENDATION
PAGE -29

01 Supreme Court's decision in *Blakely* could not apply retroactively on collateral review to a

02 conviction that became final before *Blakely* was decided.  There is no current United States

03 Supreme Court precedent holding that *Blakely* may be applied retroactively to cases such as

04 petitioner's which became final before *Blakely* was decided.  Accordingly, petitioner's federal

05 habeas petition should be denied with respect to his ninth ground for relief.

06                                                   <u>CONCLUSION</u>

07          For the reasons set forth above, this Court recommends that petitioner's federal habeas

08 petition be denied and that this action be dismissed with prejudice.  A proposed order accompanies

09 this Report and Recommendation.

10          DATED this <u>6th</u> day of March, 2007.

11

12                                        Mary Alice Theiler
                                          United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -30